UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PATRICK J. DONNELLY,
        Petitioner,

     -v-

CONTROLLED APPLICATION REVIEW
AND RESOLUTION PROGRAM UNIT, *et al.*,
        Respondents.

19-CV-4932 (JPO)

OPINION AND ORDER

J. PAUL OETKEN, District Judge:

  This is an immigration case concerning Petitioner Patrick J. Donnelly's protracted effort to become a U.S. citizen. Before proceeding to the merits of Petitioner's case, the Court must satisfy itself of its jurisdiction. For the reasons that follow, the Court concludes that it lacks jurisdiction and grants Respondents' motion to dismiss.

**I. Background**

  Petitioner, a citizen of Ireland, filed his naturalization application on September 14, 2009. (Dkt. No. 43 at 6.) His application process has been beleaguered by delays. Respondents did not schedule Petitioner's initial hearing until 2014, five years after his application was filed. (*Id.*) It took Respondents another seven months to rule on his application, denying it in 2015 for reasons relating to Petitioner's recitation of his previous five years of employment. (*Id.*) Specifically, Respondents concluded that Petitioner had intended to lie when he failed to mention that he was CEO of a company from 1999 to 2006. (Dkt. No. 2-8 at 7.) Petitioner countered that he did not believe himself to be employed by the company, which reported just $16,000 in profits in 2004 and dissolved in 2005, during the five-year period that he was meant to describe on his 2009 application. (Dkt. No. 2-8 at 7–8.) Petitioner administratively appealed this first denial, and Respondents affirmed the denial for the same employment-related reasons in 2016, one year and

1

seven months later.  (Dkt. No. 2-8 at 9–10.)  Petitioner then challenged Respondents' final agency decision by filing a petition for review in this Court (*Donnelly v. Coven*, 17-cv-321 (S.D.N.Y.)).  (*See* Dkt. No. 2-8.)  In 2017, the parties agreed that Respondents would reopen Petitioner's application, and Petitioner voluntarily dismissed his case.  (*See* Dkt. No. 2-9.)

Persuaded that they could not deny Petitioner's application based on his employment history, Respondents took a new approach.  One year after reopening Petitioner's application, Respondents held another hearing for Petitioner.  (Dkt. No. 43 at 6.)  At this hearing, on January 23, 2018, Respondents placed greater focus on Petitioner's criminal history in Ireland.  (*Id.*)  In particular, Respondents asked for further details on an incident that Petitioner had mentioned at his 2014 hearing.  (Dkt. No. 43 at 6–7.)  At the 2014 hearing, Petitioner had informed Respondents that he was once questioned for three days by the Irish police "about where [he] was and where [he] worked," as well as "where [he] was going and where [he] lived."  (Dkt. No. 36-2 at 6.)  At the time, Petitioner did not characterize this incident as an arrest because, during the Troubles, or the three-decade conflict over the status of Northern Ireland, "[t]hat's how it was."  (*Id.*)  Petitioner stated that such questioning was "common" and that he was not charged after the incident.  (*Id.*)  Respondents had accepted Petitioner's responses in 2014.  But they did not at the January 23, 2018 hearing, and Petitioner eventually conceded that his questioning in Ireland could be construed as an arrest.  (Dkt. No. 36-2 at 8.)

After the hearing, Respondents requested that Petitioner provide documentary evidence regarding the incident in Ireland.  (Dkt. No. 1-1 at 3.)  In response, Petitioner sought and submitted a report from the United Kingdom's National Police Chiefs' Council that stated that Petitioner had no "convictions, cautions, final warnings or reprimands" in the country.  (Dkt. No. 2-6.)  Meanwhile, Respondents purportedly sought and received records from the Police Service

2

of Northern Ireland showing that Petitioner had been fined between 10£ and 75£ for four traffic infractions and that the incident Petitioner had previously discussed was a 1985 arrest pursuant to the Prevention of Terrorism (Temporary Provisions) Act of 1976.  (Dkt. No. 1-1 at 4.) Respondents did not produce any of these records to Petitioner, and on May 22, 2018, precisely 120 days after the hearing, Respondents denied Petitioner's naturalization application based on the records.  (Dkt. No. 44 at 7–8.)  Furthermore, Respondents concluded that, because Petitioner had failed to inform them of the traffic infractions and the 1985 incident when he obtained his status as a lawful permanent resident, he had not properly obtained that status.  (Dkt. No. 1-1 at 4–5.)  Respondents stripped him of the status.  (*Id.*)

Petitioner administratively appealed Respondents' decision on June 23, 2018.  (Dkt. No. 1 at 7.)  When Respondents failed to schedule a hearing by May 28, 2019, 340 days later, Petitioner filed this action.  (Dkt. No. 1 at 7–8.)  Shortly thereafter, Respondents scheduled Petitioner's hearing, which Petitioner declined to attend because of the pending litigation and his concern that Respondents were operating in bad faith.  (Dkt. No. 44 at 8– 9.)  On October 31, 2019, Respondents affirmed their May 22, 2018 denial in full.  (*See* Dkt. No. 36-2.)  Within the week, Respondents initiated removal proceedings.  (Dkt. No. 43 at 8.)

On January 17, 2020, Respondents filed a motion to dismiss Petitioner's case. Respondents primarily argue that Petitioner's case must be dismissed under Rule 12(b)(1) of the Federal Rules of Civil Procedure for want of subject-matter jurisdiction.  In the alternative, they argue that their initiation of removal proceedings during the pendency of this case precludes the Court from granting Petitioner's naturalization application and thus warrants dismissal of the case under Rule 12(b)(6) for failure to state a claim upon which relief can be granted.  (*See* Dkt. No. 42.)

## II. Legal Standard

The Court must dismiss a claim *sua sponte* or under Rule 12(b)(1) when the Court "lacks the statutory or constitutional power to adjudicate it." *Cordlandt St. Recovery Corp. v. Hellas Telecomms., S.A.R.L.*, 790 F.3d 411, 417 (2d Cir. 2015) (citation omitted). In considering a Rule 12(b)(1) motion to dismiss for lack of subject-matter jurisdiction, the Court "must accept as true all material factual allegations in the complaint" or application, but it cannot "draw inferences . . . favorable to plaintiffs" or petitioners. *J.S. ex rel. N.S. v. Attica Cent. Sch.*, 386 F.3d 107, 110 (2d Cir. 2004) (citation omitted). "A [party] asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000) (citation omitted). To determine if Petitioner has carried his burden, the Court "may refer to evidence outside the pleadings." *Id.* (citation omitted).

## III. Discussion

8 U.S.C. § 1421(a) provides that "[t]he sole authority to naturalize persons as citizens of the United States is conferred upon the Attorney General." Section 1421(c) creates an exception to this exclusive authority, applicable when an "application for naturalization . . . is denied, after a hearing before an immigration officer" conducted as part of an administrative appeal; in such instances, when the denial is final, an applicant "may seek review of such denial" in the appropriate district court. 8 U.S.C. § 1447(b) establishes a second exception, applicable when an initial decision on an application is not rendered "before the end of the 120-day period after the date on which the examination [or hearing] is conducted" to assess the application. Section 1447(b) explicitly provides that, in such instances, the appropriate district court "has jurisdiction over the matter and may either determine the matter or remand the matter."

Petitioner acknowledges that §§ 1421(c) and 1447(b) are the only subsections of Title 8 describing circumstances in which an applicant for naturalization may seek judicial review.

4

(Dkt. No. 44 at 12–13.)  He further acknowledges that his case, at the time of filing, did not meet the express requirements of either § 1421(c) or § 1447(b):  On May 28, 2019, the denial of Petitioner's application was not yet final, but the initial decision on his application had already been rendered, within 120 days of the hearing to assess his application.  Still, Petitioner asserts that the Court has jurisdiction under § 1421(c) because the "exhaustion of administrative remedies is not jurisdictional."  (Dkt. No. 44 at 13.)  He casts § 1421(c) as a mere claims-processing rule, the restrictions of which "courts should treat . . . as nonjurisdictional in character."  *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 516 (2006); *see also Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154, 161–62 (2010).  As the Second Circuit has explained, claims-processing rules generally "ha[ve] the effect of imposing a bar to . . . review," *Zhong v. U.S. Dept. of Justice*, 480 F.3d 104, 122 (2d Cir. 2007), but their requirements are "subject to equitable considerations such as waiver, estoppel or futility," *id*. at 120 (quotation omitted).

      Equitable considerations certainly support reviewing Petitioner's claims.  Judicial review appears "necessary to avoid manifest injustice."  *Marrero Pichardo v. Ashcroft*, 374 F.3d 46, 53 (2d Cir. 2004).  As described, Respondents' processing of Petitioner's application, filed over a decade ago, has been rife with delay.  At the time Petitioner filed this case, 340 days had passed since Petitioner submitted his administrative appeal of Respondents' decision, and Respondents had yet to respond.  By their own regulations, Respondents must "schedule a review hearing, within a reasonable period of time not to exceed 180 days from the date upon which the appeal is filed."  8 C.F.R. § 336.2.  Respondents' failure to schedule Petitioner's hearing was definitionally unreasonable.

      Worse than the delay, however, Respondents' denial of Petitioner's application was based in part on Petitioner's supposed nondisclosure of information about the 1985 incident,

which Petitioner in fact freely offered during his first hearing in 2014.  And while Respondents claim that information from the Police Service of Northern Ireland contradicts Petitioner's representations from 2014, the Police Service has informed Petitioner that all records relating to "detained terrorist suspects for the period 1985 to 1993" "have been shredded or buried."  (Dkt. No. 2-12.)  Respondents' denial was also based on Petitioner's nondisclosure of four traffic infractions, which Respondents referred to in their decisions and in this litigation as "convictions" and "arrests."  (Dkt. No. 1-1 at 4; Dkt. No. 39-3 at 4; Dkt. No. 43 at 7.)  But Respondents' own guidance for applicants like Petitioner instructs:  "In general, you do not need to submit documentation relating to traffic fines and incidents that did not involve an actual physical arrest if the penalty was only a fine of less than $500 or points on your driver's license."  Dep't of Homeland Security, U.S. Citizenship and Immigration Services, *Instructions for Application to Register Permanent Residence or Adjust Status* 16 (2020).  The only instances in which applicants must disclose such traffic infractions arise when "the traffic incident resulted in criminal charges or involved alcohol, drugs, or injury to a person or property."  *Id*.; *see also* Dep't of Homeland Security, U.S. Citizenship and Immigration Services, *Instructions for Application for Naturalization* 13–14 (2020).  It stretches credulity, and calls into doubt Respondents' interpretation of any records they received from the Police Service of Northern Ireland, to suggest that the four traffic infractions could have any bearing on Petitioner's immigration status.  Is the Court to believe that Petitioner was physically arrested or criminally charged for all four infractions, each of which resulted in a fine between 10£ and 75£ and none of which involved alcohol, drugs, or injury to another person? (Dkt. No. 1-1 at 4.)

      Of course, neither Petitioner nor the Court can definitively dismiss Respondents' interpretation of any records from the Police Service of Northern Ireland because these records

were not provided to Petitioner or to the Court.  Respondents' failure to provide these records to Petitioner compounds the injustice of Petitioner's circumstances.  Relying on the records, Respondents stripped him of his lawful permanent resident status and then found that Petitioner was statutorily ineligible for citizenship.  Once again, this violated federal regulations.  8 C.F.R. § 103.2(b)(16)(ii) dictates: "A determination of statutory eligibility shall be based only on information contained in the record of proceeding which is disclosed to the applicant," save for information classified in the interest of national security.  At no point did Respondents indicate that the records from the Police Service of Northern Ireland were classified.

At the end of Petitioner's decade-long process, and notwithstanding their own noncompliance with numerous regulations meant to protect the rights of those situated like Petitioner, Respondents demand that Petitioner pay the hefty price of deportation and separation from his American family.  That is a manifest injustice.  But it is ultimately an injustice that the Court is powerless to correct.

Although courts can excuse noncompliance with a claims-processing rule to avoid manifest injustice, no equitable considerations can empower a court to hear a claim over which it lacks jurisdiction.  *See Grullon v. Mukasey*, 509 F.3d 107, 114–16 (2d Cir. 2007) (overruling cases that employ "the 'manifest injustice' exception to the jurisdictional bar created by [a statutory] exhaustion requirement").  In *Escaler v. U.S. Citizenship and Immigration Services*, the Second Circuit treated § 1421(c)'s exhaustion requirement as jurisdictional and not as a claims-processing rule.  582 F.3d 288, 293 (2d Cir. 2009) (finding that the petitioner's failure to exhaust administrative remedies "negates our jurisdiction over the present action").  Even though the Sixth and Ninth Circuits, relying on a string of Supreme Court cases decided slightly after *Escaler*, diverged from this Circuit's practice and identified § 1421(c) as non-jurisdictional,

*Shweika v. Dep't of Homeland Security*, 723 F.3d 710, 719 (6th Cir. 2013); *Eche v. Holder*, 694 F.3d 1026, 1028 (9th Cir. 2012), this Court remains bound by *Escaler*.

In the Supreme Court cases on which the Sixth and Ninth Circuits relied, the disputed rule stood as a roadblock to accessing courts that already had jurisdiction to review claims like those brought by the plaintiff.  *See Reed Elsevier*, 559 U.S. at 164–65 ("Federal district courts have subject-matter jurisdiction over copyright infringement actions based on 28 U.S.C. §§ 1331 and 1338.  But neither § 1331 . . . nor § 1338(a) . . . conditions its jurisdictional grant on whether copyright holders have registered their works before suing."); *Henderson ex rel. Henderson v. Shinseki*, 562 U.S. 428, 439–40 (2011) (explaining that the Veterans Court already had jurisdiction and that "[n]othing" in any statute purported to deprive the Veterans Court of its jurisdiction based on when a plaintiff files suit).  In those cases, the question was whether the plaintiff's failure to comply with the disputed rule deprived the courts of their extant jurisdiction.  Here, § 1421(c) *grants* the Court authority to review claims, notwithstanding § 1421(a)'s pronouncement that "[t]he sole authority to naturalize persons as citizens of the United States is conferred upon the Attorney General."  When a petitioner's case does not fall into the exceptions carved out by § 1421(c) or § 1447(b), the Court lacks adjudicatory authority.  *See Reed Elsevier*, 559 U.S. at 160 ("'Jurisdiction' refers to 'a court's adjudicatory authority.'" (citation omitted)).

Petitioner does argue, if briefly, that his case actually meets § 1421(c)'s requirements.  He contends that "the Court's jurisdiction under 8 U.S.C. § 1421(c) has now clearly been invoked following the denial of the administrative appeal on October 31, 2019." (Dkt. No. 44 at 15.)  Although Petitioner now has a final agency decision, it does not appear that he satisfied § 1421(c)'s precise jurisdictional precondition: that he have "a hearing before an immigration officer under section 1447(a) of [Title 8]."  Petitioner did not participate in his administrative

8

appeal.  Believing that the government was acting in bad faith, Petitioner declined to attend his scheduled hearing.  Even if the Court could consider claims raised in a prematurely filed § 1421(c) petition, *e.g.* by treating a post-denial amended petition as a new petition, doing so here would necessitate disregarding § 1421(c)'s demand for how petitioners participate in the administrative process.  *See Duplan v. Harper*, 188 F.3d 1195, 1199–1200 (10th Cir. 1999) (recognizing that "as a general rule, a premature 'complaint cannot be cured through amendment'" but construing an amended complaint "as instituting a new action" anyway, based on equitable considerations (citing *Sparrow v. USPS*, 825 F. Supp. 252, 255 (E.D. Cal. 1993))).

Finally, Petitioner argues that, even if the Court lacks jurisdiction to review his application, it still can adjudicate his other claims.  Petitioner's other claims, however, go to the heart of the reasoning used by Respondents in denying Petitioner's application.  (Dkt. No. 39 at 17.)  The Court has no more authority to undo Respondents' review of Petitioner's application than it has to grant the application altogether.

**IV.   Conclusion**

For the foregoing reasons, Respondents' motion to dismiss is GRANTED.  The Clerk of Court is directed to close the motion at Docket Number 42 and to close this case.

SO ORDERED.

Dated: November 30, 2020
New York, New York

_____
J. PAUL OETKEN
United States District Judge